UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR408-023 |
| | ) | |
| DA ZHONG OUYANG, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Da Zhong Ouyang, who is charged with harboring and employing undocumented aliens, has filed a motion to suppress evidence seized during warrant-based searches of his home and business, as well as statements he made to federal agents after his arrest. (Doc. 22.) The Court held a hearing on these matters, at which time the government offered testimony from Agents Scott McCormack and Trey Taylor of Immigration and Customs Enforcement ("ICE"). Ouyang did not testify. For the following reasons, his motion to suppress should be **DENIED**.

I. **ANALYSIS**

Defendant contends that any evidence seized during the search of his home and business should be suppressed because the search warrants were not supported by probable cause and they failed to identify the items to be seized with sufficient particularity. (Doc. 22.) He further contends that any statements he made should be suppressed because they were taken in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).[1] (Doc. 22.)

A. **Probable Cause**

Ouyang first argues that the affidavits presented by Special Agent Scott McCormack were insufficient to support a finding of probable cause that evidence of the harboring and employment of undocumented aliens would be found at his home and business. (Id.) A thorough review of the affidavits demonstrates otherwise.

The search warrant affidavits relate that on May 18, 2005 the Heritage Bank in Hinesville, Georgia advised the Federal Bureau of

---

[1] Ouyang also argues that the government agents' conduct exceeded the scope of the search warrants. (Doc. 22 at 3.) However, he presents no facts underlying this assertion, so the Court cannot meaningfully analyze the claim.

Investigation ("FBI") that a person identified as Ben Da Zhu had transferred monies in excess of $500,000 from the bank to the People's Republic of China. On November 28, 2005, Agent McCormack and FBI Special Agent Crum followed up on this tip by interviewing Barbara Smith, a senior vice president with Heritage Bank. She told the agents that another Chinese national, Ren Yao Weng, had transferred over $300,000 to the People's Republic of China. Weng regularly brought other people into the bank to conduct the wire transfers. The accompanying person's name and social security number were used, but it was clear to the bank employees that Weng was in possession of the money and orchestrated the transactions. Smith believed that Weng was structuring the transactions to evade certain federally mandated reporting and recordkeeping requirements.

In the course of their investigation of these suspicious banking transactions, McCormack and Crum found that several of the people who accompanied Weng to the bank were employees of the China Super Buffet, located at 708 East Oglethorpe Highway in Hinesville, Georgia. The China Super Buffet is owned by Ren Yao Weng's brother-in-law, Da Zhong

Ouyang, the defendant in this criminal action. Upon linking Ouyang to the suspicious transactions, the agents broadened their surveillance to include his residence at 800 Hod Lane in Hinesville.[2]

On January 11, 2007, at 7:30 p.m., Agent Watts of the FBI dined at Ouyang's restaurant, where he counted ten employees working the closing shift. At 9:45 p.m., Ouyang drove a white Ford passenger van from his home to the restaurant. He left the restaurant at 10:00 p.m. with Weng, six other Asian workers, and two Hispanic workers. Ouyang drove the van directly back to his residence. The employees exited the van, removed their shoes, placed them on a rack located on the front porch, and entered the home. Subsequent video surveillance recorded on four separate occasions between April and May of 2007 show the same routine: Ouyang transports eight to thirteen employees from his home to the restaurant every morning at approximately 9:30 a.m.; at approximately 11:00 p.m., the employees again board the van and are transported back to Ouyang's residence.

After determining that the employees both live and work with Mr.

---

[2] The affidavits note that the home is peculiar. It features a fenced section in the rear which is topped with two rows of barbed wire. The garage door is inoperable and is tied down to a basketball hoop. The side door is blocked by an old washing machine, and surveillance cameras are mounted on the home's exterior walls.

Ouyang, McCormack examined the restaurant's 2005 and 2006 quarterly tax and wage reports. The restaurant only reported seven total employees for each quarter, which is inconsistent with the number of employees repeatedly observed during surveillance. Furthermore, the supplied social security numbers belonged solely to individuals with Chinese last names, though the government's surveillance established that Ouyang employed between two and three workers of Hispanic origin.

Agent McCormack believed that these facts, taken together, indicated that Ouyang was employing undocumented aliens. Accordingly, on January 22, 2008, he applied to this Court for warrants to search Ouyang's home and business for further evidence supporting this inference. The Court issued the warrants after careful consideration of McCormack's affidavits.

Ouyang contends that the warrant affidavits reveal "no connection between the alleged illegal transactions and the residence or business premises." (Doc. 22 at 2.) Consequently, he contends that the warrants are not supported by probable cause. (Id.)

The Constitution provides that no search warrant shall issue except "upon probable cause." U.S. Const. amend. IV. While the probable cause

standard has never been precisely quantified, it is settled that it requires neither convincing proof nor even a prima facie showing of criminal activity. Illinois v. Gates, 462 U.S. 213, 235 (1983). A "substantial chance" of criminal activity is all that is required, "not an actual showing of such activity," id. at 244 n. 13, and it need not arise from direct observation but may be inferred from the circumstances involved. United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990); United States v. Lockett, 674 F.2d 843, 846 (11th Cir. 1982). On review the Court is not to make a *de novo* determination of probable cause; it is merely to evaluate whether the issuing magistrate had a substantial basis for finding probable cause. Gates, 462 U.S. at 238-39.

McCormack has been an ICE agent for seven years. Before the formation of ICE, he worked as an Immigration and Nationalization Service inspector for ten years. He noted in the affidavits that based upon his extensive experience, employers who harbor undocumented aliens regularly shield those aliens from detection by supplying housing to the undocumented workers and transporting those workers to and from work. By supplying housing to the workers, their names do not appear on any

leases and they cannot be easily discovered through the use of record checks and subpoenas. By transporting the workers, the aliens avoid law enforcement scrutiny and the difficulty of obtaining a valid driver's license. Additionally, McCormack indicated that the restaurant's apparent failure to report the Hispanic employees in its quarterly tax and wage reports is the typical practice of those who employ undocumented aliens; the employer cannot comply with governmental reporting requirements for workers who lack a valid social security number.

McCormack's educated deductions and inferences, taken along with the suspicious financial transactions and the strange living and employment conditions observed by the agents, lead the Court to the find that the affidavits sufficiently link Ouyang's residence and business to the possible harboring and employment of undocumented aliens. The information Agent McCormack provided the Court in his affidavits was therefore sufficient to establish a substantial basis for a probable cause finding to search Ouyang's business and residence.[3] Gates, 462 U.S. at 238-39.

---

[3] At the hearing, Ouyang argued that the Hispanic workers might have been independent contractors, which would explain their absence from the business records. He also argued that it is not illegal for an employee to reside with his or her employer. When considering an application for a search warrant, however, the court is to consider

## B. Particularity

Defendant next contends that the warrants fail to satisfy the Fourth Amendment's particularity requirement. (Doc. 22.) Once again, a thorough review of the warrants and accompanying affidavits refutes this contention.

General warrants do not satisfy the Fourth Amendment requirement that the warrant contain a description of the place to be searched and the persons or things to be seized. See Dalia v. United States, 441 U.S. 238, 255 (1979). The particularity requirement protects persons against indiscriminate rummaging through their property by government agents. Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). A description in a warrant is sufficiently particular "when it enables the searcher reasonably to ascertain and identify the things to be seized." United States v. Santarelli, 778 F.2d 609, 614 (11th Cir. 1985); United States v. Betancourt, 734 F.2d 750, 754-55 (11th Cir. 1984).

---

the totality of the evidence, rather than atomizing the affidavit into discreet factual averments and analyzing the significance of each separate fact in a vacuum. United States v. Ventresca, 380 U.S. 102, 109 (1965). The affidavits, read in their entirety, furnished reasonable grounds to believe that Ouyang was harboring undocumented aliens.

Here, the warrants were no doubt broad in scope.[4] However, both warrants specifically limited the search to "[a]ny and all files relating to the harboring, transporting, importation and employment of unauthorized aliens." When warrants specifically connect the items to be searched for and seized to the specific criminal conduct suspected, it weighs in favor of finding that the warrants are adequately particularized. See United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995) (finding that overly broad warrant which authorized seizure of virtually every document and computer file could have been made more particular by specifying suspected criminal conduct); United States v. Bianco, 998 F.2d 1112, 1116 (2nd Cir.1993) (finding warrant overly broad in part because it did not make reference to any type of criminal activity).

Additionally, McCormack's affidavits were attached to the warrants, which acted to further limit the scope of the searches. An affidavit can be

---

[4] Both warrants sought: (1) all travel and employment authorization documents; (2) all accounting and tax documents, books, ledgers, and records pertaining to Da Zhong Ouyang, the Ouyang Corporation, and China Super Buffet; (3) all records pertaining to wire transfers of money and any cash or monetary instruments; and (4) records evidencing ownership, occupancy, or control of the restaurant and residence. In addition to the items listed above, the warrant for the search of the restaurant requested any notebooks used to keep track of each driver's deliveries and the amount that they were to be paid.

used to meet the particularity requirement when the affidavit and the warrant can reasonably be said to be one document. See 2 Wayne R. LaFave, Search and Seizure § 4.6(a), at 558 (3rd ed. 1996); United States v. Wuagneux, 683 F.2d 1343, 1351 n.6 (11th Cir. 1982) (noting that an affidavit can be used to meet the particularity requirement if the supporting affidavit is available at the search site and the searching agents knew what they were looking for); United States v. Haydel, 649 F.2d 1152 (5th Cir. 1981), corrected, 664 F.2d 84 (5th Cir. 1981). Here, the affidavits were attached to the warrants, and they were present at the scene. When considered with the affidavit, the warrants describe in detail the transactions, parties, dates, and conduct that gave rise to the suspected crimes. The warrants therefore gave agents the authority to search for and seize documents that might be connected to the specific criminal activities alleged and certain financial transactions related to those activities.

While portions of the warrants authorized the search and seizure of documents concerning a broad spectrum of financial and business activities, the specific criminal conduct alleged in the warrants justified a broad search of these documents. When law enforcement officers cannot give an exact

description of the materials to be seized even though they have probable cause to believe that such materials exist, the courts have upheld warrants "when the description is as specific as the circumstances and the nature of the activity under investigation permit." Santarelli, 778 F.2d at 614 (citations omitted); see also United States v. Jones, 54 F.3d 1285, 1290 (7th Cir. 1995) ("In practice, courts have therefore demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description must be as particular as circumstances permit." (citation omitted)). Based upon the nature of the crimes charged, the warrants could not reasonably be expected to state with greater specificity the items to be seized. See Santarelli, 778 F.2d at 609 (holding that warrant authorizing the seizure of "all property" constituting evidence of loansharking was not overly broad because the exact identity of the evidence to be seized could not have been known at the time the warrant issued); United States v. Morisse, 660 F.2d 132, 136 (5th Cir. 1981) (upholding validity of warrant allowing for search and seizure of "drug trafficking paraphernalia, records, money, and other evidence of drug trafficking"); see also United States v. Riley, 906 F.2d 841 (2nd Cir. 1990)

11

(upholding warrant for "records of the distribution of cocaine [and of] the investment of proceeds of drug trafficking in tangible or intangible objects and things").

Finally, McCormack testified at the hearing that he was present at the search sites, and he directed the agents performing the searches. His affidavits note that he had been involved in surveilling Ouyang's home and business for some time. His personal knowledge of the information in the affidavits, his control of the search locations, and his personal knowledge of the locations searched, all weigh in favor of finding sufficient particularity.[5]

## C. Defendant's Statements

Ouyang finally contends that any statements he made during his interview with Agent Taylor of ICE and Agent Watts of the FBI should be suppressed as the product of an improper custodial interrogation. (Doc. 22.)

The facts supporting his contention are as follows. At approximately

---

[5] Ouyang also argues that it was unreasonable for the agents to rely upon the warrants. (Doc. 22 at 3.) He cites to United States v. Leon, 468 U.S. 897, 926 (1984), which created the good faith exception to the probable cause requirement. As the warrants are valid, there is no need for the government to invoke the good faith exception. This issue is therefore discarded as unnecessary surplusage.

6:00 a.m. on the morning of January 23, 2008, McCormack, Taylor, and around eight other government agents executed the search warrant at Ouyang's residence, located at 800 Hod Lane in Hinesville, Georgia. Ouyang was arrested after he was located hiding under some clothing in his closet. McCormack then transported Ouyang to his restaurant to unlock it and disarm any alarms, so that the ICE agents would not need to resort to forced entry. McCormack testified at the hearing that upon entering the restaurant he "probably" asked defendant where his employees' I-9 Employment Eligibility Verification forms were located. He admitted that Ouyang had not yet been advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).[6] Shortly thereafter, Ouyang was transported to ICE's Quick Reaction Team ("QRT") headquarters in Savannah for a formal custodial interrogation.

---

[6] It is well settled that law enforcement officials may not conduct a custodial interrogation of a suspect without first advising him of the rights guaranteed by the Fifth Amendment. <u>Miranda</u>, 384 U.S. at 471. <u>Miranda</u> determined that any custodial interrogation of a suspect involves "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." <u>Id.</u> at 467. The Supreme Court therefore created a conclusive presumption that evidence produced by custodial interrogation is coerced unless the suspect is first informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," during any questioning. <u>Id.</u> at 444.

Upon arrival at the QRT headquarters, Ouyang was taken to an interview room. At 4:35 p.m., Watts administered a <u>Miranda</u> rights waiver. Ouyang was given a copy of the waiver so that he could follow along as it was read aloud line by line. Ouyang, a naturalized citizen, has at least a rudimentary understanding of the English language.[7] Nevertheless, in order to protect his rights, Agents Taylor and Watts ensured that a translator was present who was proficient in Chinese. The translator repeated each line of the rights waiver in Chinese. Ouyang indicated that he understood his rights by nodding his head, saying "OK," and initialing each of the blocks so designated. He signed the waiver, though the date and time were filled in by the interrogating agents.

Ouyang contends that the formal interrogation was tainted by McCormack's earlier question about the location of the I-9 forms. He asserts this "bifurcated questioning situation" gave rise to a violation of

---

[7] Agent McCormack testified that Ouyang did not qualify for a language exemption for his naturalization test. Accordingly, during the naturalization process he was tested on his ability to speak and understand English. McCormack acknowledged that it is not at all uncommon for someone to pass the test with an extremely limited mastery of the language, and there is no requirement that naturalized citizens maintain their proficiency. However, McCormack further testified that Ouyang acted as a translator when he interviewed several employees during a subsequent I-9 inspection. Ouyang clearly maintains at least a very basic proficiency in English.

Missouri v. Seibert, 542 U.S. 600 (2004) (plurality opinion). His reliance on Seibert, however, is misplaced.

The police in Seibert employed a two-tiered questioning system, employing "[t]he technique of interrogating in successive unwarned and warned phases." Id. at 609. After eliciting a confession during the unwarned phase, the police advised the defendant of his or her rights, then re-elicited the confession. Id. at 609-610. The Supreme Court held that police may not intentionally employ such tactics, as they are crafted to undermine Miranda's prophylactic purpose. Id. at 616.

The Court took care, however, to note certain "relevant facts" that bear on the whether a subsequent statement is tainted by a prior interrogation, including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615. Here, McCormack "probably" asked Ouyang where he kept his I-9

forms.[8] This single question certainly cannot be said to have been a complete or detailed interrogation, as contemplated in Seibert. The timing of the question and the lack of continuity of police personnel similarly weigh against finding a violation. McCormack asked the question hours before Watts administered the rights waiver, and he testified at the hearing that he was not present at the formal interrogation. Finally, there is no indication that the interrogating agents treated the second round as a continuation of McCormack's earlier lone question. Seibert simply does not apply on these facts.

Even if the initial question elicited information that should be excluded under Miranda,[9] "[n]o further purpose is served by imputing

---

[8] Though no warrants or subpoenas are required to perform an I-9 inspection, inspecting officers must provide the employer with three days notice before the date of the inspection. 8 C.F.R. § 274a.2 (b)(2)(ii). Accordingly, the right to inspection does not necessarily shield the agents' actions in this instance.

[9] The question of the admissibility of Ouyang's response to the I-9 question is not presently in dispute. Nevertheless, the Court notes that Miranda safeguards apply only to a defendant who is both "in custody" and subjected to "interrogation." Miranda, 384 U.S. at 468. Here, there is a strong probability that the question did not qualify as an "interrogation," which the Supreme Court defined as referring to both express questioning by the police and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). McCormack simply sought assistance in executing a valid search warrant. As employers are required to maintain I-9 forms for their employees, 8 C.F.R. § 274a.2 (b)(2)(ii), it is quite a stretch to hold that simply asking for the location of these records was calculated to lead to an incriminating response.

'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." Oregon v. Elstad, 470 U.S. 298, 318 (1985). A valid waiver of Miranda rights must be knowing, voluntary, and intelligent. Colorado v. Spring, 479 U.S. 564, 573 (1987); United States v. Gaddy, 894 F.2d 1307, 1312 (11th Cir. 1990). The government bears the burden of proving by a preponderance of the evidence that the waiver is valid. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997); United States v. Farris, 77 F.3d 391, 396 (11th Cir. 1996). "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, 'including the background, experience, and conduct of the accused.'" Gaddy, 894 F.2d at 1312 (citation omitted); see also Edwards v. Arizona, 451 U.S. 477, 486 (1981) (waiver must be knowing and intelligent under the totality of the circumstances).

Applying these standards, the Court concludes that Ouyang voluntarily, knowingly, and intelligently waived his Miranda rights. Although Ouyang may not be entirely fluent in English, the presence of the translator ensured that he fully understood his rights. As noted above, Ouyang indicated that he understood those rights, and he willingly signed the waiver form and answered the agents' questions. There is neither any

indication that defendant was confused about what rights he was waiving or the consequences of his decision to consent to the interview, nor that the answers given were the product of any improper coercion. Agent Taylor testified that Ouyang appeared to be lucid and alert during the interview. There was no indication that he was under the influence of alcohol or any other intoxicant. As the waiver was knowing, voluntary, and intelligent, the Court should "not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but should instead assume that ordinarily giving proper Miranda warnings removes the effect of any conditions requiring suppression of the unwarned statement." United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (citations omitted).

## II. CONCLUSION

For the foregoing reasons, defendant's motion to suppress should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 11Th day of April, 2008.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA